JUDITH DIGHELLO,

        Plaintiff,

v.

THURSTON FOODS, INC.,

        Defendant.

Civil Action No.
3: 16 - CV - 1340 (CSH)

**MAY 9, 2018**

## RULING ON DEFENDANT'S MOTION TO DISMISS [DOC. 16]

**HAIGHT, Senior District Judge:**

In this employment discrimination and wrongful discharge case, defendant and former employer Thurston Foods, Inc. ("Thurston") moves the Court to dismiss three of Plaintiff Judith Dighello's claims. The Court resolves the motion herein.

## I. BACKGROUND

The facts summarized in this Ruling are extracted from the allegations of Plaintiff's Complaint. In March of 2011, Plaintiff commenced employment with Defendant Thurston, a wholesale food service distributor, as a router and dispatcher. Doc. 1 ("Complaint"), ¶ 6. In that position, she coordinated routes for the company's delivery trucks and drivers. *Id.* Plaintiff alleges that due to the doubling of her workload over time and "the fact that she was instructed to coordinate deliveries for approximately fifty-five (55) vehicles," Thurston required her to work "twelve and a half (12.5) hour shifts, without breaks for lunch or rest, each day." *Id.*, ¶ 9.

In early April 2015, Plaintiff became ill "with walking pneumonia and a respiratory infection." *Id.*, ¶ 10. According to Plaintiff, her physician instructed her to remain out of work for

1

two days. *Id.* Plaintiff provided Thurston with a copy of an "out-of-work note from her physician." *Id.* In response to the note, Thurston informed her that she was not entitled to sick pay. *Id.*, ¶ 11. When Plaintiff returned to work two days later, she informed Thurston's management that she would need to "lighten her work load, at least temporarily, until her symptoms improved." *Id.*, ¶ 12. Thurston's management then allegedly reminded her that she was not permitted to take breaks and that she must work twelve and a half hour shifts. *Id.*

Plaintiff further alleges that on or around the time of her illness, Thurston "hired a male employee named Art (last name unknown)," whom she believes was "hired to replace" her. *Id.*, ¶ 13. Art worked with Plaintiff for a period of time and also went to classes "to learn how to perform the [P]laintiff's job duties." *Id.*, ¶ 14. Moreover, around this time, Bob Thurston, the Defendant's secretary and head of transportation, told Plaintiff, "Women should not be hired for this position" because they "are too weak for this job." *Id.*, ¶ 15.

Shortly thereafter, Plaintiff suffered a bronchial asthma attack while in the office and went to MidState Medical Center in Meriden for emergency treatment. *Id.*, ¶ 16. While at the medical center, she "underwent x-rays, was prescribed an inhaler, and was put on medication." *Id.*, ¶ 17. When Plaintiff returned to work, "and despite her condition," she was "again instructed by [her employer] that she was still required to work the full twelve and a half (12.5) hour shifts, without breaks for rest or lunch." *Id.*, ¶ 17.

During late April 2015, "in response to a failed EPA inspection," Bob Thurston instructed Plaintiff to assemble logs for the EPA, describing how much fuel was dispensed to each of approximately fifty (50) separate drivers dating back two weeks. *Id.*, ¶ 29. Plaintiff informed Bob Thurston that "she was already busy handling dispatch and routing" and "was already working twelve

and a half (12.5) hours per day." *Id.*, ¶ 30.  She suggested that "another employee could easily handle the task" of assembling the logs, but Bob Thurston responded by instructing her to "come in earlier and get it done." *Id.*

On or about May 7, 2015, after compiling the forms from information provided by Jim Thurston, another representative of Defendant, Plaintiff submitted the requested report to Bob Thurston.  *Id.*, ¶ 32.  Bob  reacted by waving the pages of the report in front of Plaintiff's face and "screaming at her" in front of ten other employees, complaining "that the numbers contained in the report did not match." *Id.*   Plaintiff informed him that she "had checked the math on the reports three times" and "understood that the numbers did not match." *Id.*, ¶ 33.  Nevertheless, she had input the information that Jim Thurston had provided.  *Id.*  Bob Thurston continued with his "verbal tirade," this time accusing Plaintiff of not knowing how to do math.[1]  *Id.,* ¶ 34.    He concluded by screaming, "I have to do your job myself, because you're incompetent." *Id.*, ¶ 35.

"[S]haking in fear and embarrassment," Plaintiff informed the human resources representative that she needed to take a break, and she proceeded to walk to the parking lot." *Id.*, ¶ 36.  Jim met her there to apologize for Bob's behavior, stating, "Bob is way too intense." *Id.*, ¶ 37.  Plaintiff thereafter went down the street to purchase a coffee and calm down.  *Id.*, ¶ 38.  She called to speak with her supervisor, Greg, and requested the cell phone number of Defendant's human resources representative.  *Id.*, ¶ 39.  Greg told her "not to come back until she spoke with the human resources representative." *Id.*, ¶ 40.  Plaintiff then asked Greg if Art had been hired to replace her, to which Greg responded, "I don't know." *Id.*

---

[1]  Specifically, Bob Thurston allegedly screamed, "Don't you know how to do math?  I knew how to do math when I was six years old in kindergarten." Doc. 1, ¶ 34.

Subsequently, the human resources representative phoned Plaintiff to say that the problem with the logs was that the receipts Jim Thurston provided her were "incomplete." *Id.*, ¶ 41. Plaintiff then protested that, in any event, assembling the logs was not part of her job; but the representative countered, stating that "We do not have job descriptions" so that "[w]hat we give you to do is in your job description." *Id.*, ¶ 42.

Plaintiff then complained that "she felt she was being threatened and was being subject[ed] to a hostile work environment." *Id.*, ¶ 43. The representative was unsympathetic, telling her, "Being hostile isn't illegal." *Id.* Moreover, if she could not handle "yelling and screaming, maybe this [was]n't the job for [her]." *Id.* Plaintiff then asked whether she was fired, but received no response, and the conversation ended. *Id.*, ¶ 44. Afterward, Plaintiff texted Greg, asking, "Am I fired?" *Id.*, ¶ 45.

Two hours later, Greg replied by texting that she had left the company "high and dry on break" and there was "no need for 2 weeks of notice." *Id.*, ¶ 46. He also texted that "we will pack your stuff. Tell me where were can meet tonight to give you your stuff." *Id.* After that exchange with Greg, Plaintiff was not allowed back into Defendant's facility, even to retrieve her coat; and her cell phone was shut off within two hours. *Id.*, ¶ 47.

Under these circumstances, Plaintiff alleges she was wrongfully terminated on May 7, 2015. *Id.*, ¶ 48. In particular, Plaintiff alleges that she was discriminated against on the basis of her sex/gender, treated disparately as compared with similarly situated male employees, subjected to a hostile work environment, and replaced by a male employee with less experience. *Id.*, ¶ 49.

In her Complaint, Plaintiff alleges nine causes of action.[2]  In the first three counts of her Complaint, Plaintiff alleges violations under Connecticut's Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(1).  These include the  "First Count" for discrimination based on "sex/gender" and wrongful termination; the "Second Count" for disability discrimination, perceived disability discrimination, and wrongful termination; and the "Third Count" for failure to accommodate.  In her fourth and fifth counts, Plaintiff includes two retaliation claims: the "Fourth Count" for retaliation in violation of Conn. Gen. Stat. § 46a-60(a)(4) and the "Fifth Count" for retaliation in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2612, *et seq*.  Also, under the FMLA, Plaintiff pleads the "Sixth Count" for alleged interference in violation of the FMLA.  In addition, Plaintiff includes two state tort claims as the "Seventh Count" and "Eighth Count": intentional infliction of emotional distress and common law wrongful discharge, respectively.  Finally, Plaintiff sets forth a "Ninth Count," alleging that by terminating Plaintiff for exercising her federal and state constitutional rights to free speech, Thurston violated Conn. Gen. Stat. § 31-51q.

Pending before the Court is Defendant's "Motion to Dismiss" [Doc. 16] in which Thurston requests that the Court dismiss three of Plaintiff's claims for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6).  Thurston requests the Court to dismiss the following

---

[2]  Plaintiff originally brought this action against her former employer, Thurston, in the Connecticut Superior Court for the Judicial District of New Haven at Meriden.  That action included, *inter alia*, claims for gender discrimination and wrongful termination in violation of Conn. Gen. Stat. § 46a-60(a)(1).  Defendant removed the action to this Court on August 8, 2016, pursuant to 28 U.S.C. § 1331, because Plaintiff's action "involves a federal question as Plaintiff seeks to recover damages pursuant to the FMLA [Family Medical Leave Act], 29 U.S.C. § 2612, *et seq*." Doc. 1 ("Notice of Removal"), ¶ 4.  Moreover, the Notice of Removal was filed in compliance with 28 U.S.C. § 1446(b), "within 30 days of Thurston's receipt of the Complaint."  *Id.*, ¶5.

three counts: (1) the Fifth Count in that Plaintiff "has failed to adequately allege that she exercised rights under the Family Medical Leave Act" ("FMLA"); (2) the Sixth Count because Plaintiff "has failed to allege that she requested [leave under] the [FMLA] or exercised any rights under the FMLA" and /or that she "was denied any requested leave;" and (3) the Eighth Count because Plaintiff has "failed to allege the lack of a statutory remedy which is fatal to her claim." Doc. 16, at 1.

## II. DISCUSSION

### A. Standard of Review - Rule 12(b)(6), Fed. R. Civ. P.

The standard of review for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), "for failure to state a claim upon which relief can be granted," is set forth in the United States Supreme Court's seminal holding of *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under *Iqbal*, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S 544, 570 (2007)).[3] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than the unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555).

"[W]hether a complaint states a plausible claim for relief will [ultimately] . . . be a

---

[3]  The Second Circuit has consistently adhered to the United States Supreme Court's "plausibility" standard set forth in *Iqbal*. *See, e.g.*, RICHARD O'DONNELL, on behalf of himself & all others similarly situated, Plaintiff-Appellant, v. AXA EQUITABLE LIFE INSURANCE COMPANY, Defendant-Appellee., No. 17-1085-CV, 2018 WL 1720808, at *4 (2d Cir. Apr. 10, 2018)*; Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 94 (2d Cir. 2017); *Christine Asia Co. v. Ma*, No. 16-2519-CV, 2017 WL 6003340, at *1 (2d Cir. Dec. 5, 2017).

context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 663-64. When "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

"Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). *See also Amaker v. New York State Dept. of Corr. Servs.*, 435 F. App'x 52, 54 (2d Cir. 2011) (same). Accordingly, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted)). Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

**B.**     **Fifth Count (Retaliation in Violation of FMLA) and Sixth Count (Interference in Violation of FMLA)**

For purposes of the present motion, the Court reviews the allegations in Plaintiff's Fifth and Sixth Counts to determine whether they state plausible claims for relief under the Family and Medical Leave Act. In this review, the Court "accept[s] all factual claims in the complaint as true and draw[s] all reasonable inferences in the plaintiff's favor." *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 135 n.11 (2d Cir. 2015).

**1.**     **Standard of Law**

The Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, provides

employees with distinct rights to take leave under certain medical circumstances. First, it "generally requires covered employers to grant employees who have worked for twelve months (or 1250 hours in twelve months) up to twelve weeks' leave during any twelve month period for, *inter alia*, a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Hale v. Mann*, 219 F.3d 61, 68 (2d Cir. 2000) (quoting 29 U.S.C. § 2612(a)(1)(D)). The FMLA also allows an eligible employee to take "a total of 12 workweeks of leave during any 12-month period . . . [i]n order to care for the spouse, or a son, daughter, or parent, of the employee," if such relative "has a serious health condition . . . ."[4] 29 U.S.C. § 2612(a)(1)(C). Furthermore, the FMLA "protects an employee from discharge or demotion by an employer if that action is motivated by the employee's taking of leave pursuant to the FMLA." *Hale*, 219 F.3d at 68 (citing 29 U.S.C. § 2614(a)(1)).

The Second Circuit recognizes two types of FMLA claim: retaliation and interference. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir.2004) (per curiam). To plead an FMLA retaliation claim, one must establish: "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168. *See also Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (applying FMLA retaliation elements set forth in *Potenza*).

If one brings a retaliation claim, alleging that an employer has retaliated for an employee's exercise of FMLA rights, the Second Circuit employs the *McDonnell Douglas* burden-shifting

---

[4] Under the FMLA, the term "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves" either "inpatient care" in a medical facility or "continuing treatment by a health care provider." 29 U.S.C. § 2611 (11)(A)-(B).

analysis.[5] *See Potenza.*, 365 F.3d at 168 ("In the context of [Plaintiff]'s claim, the retaliation analysis pursuant to *McDonnell Douglas* is applicable."). *See also Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016) ("We will analyze the retaliation claims brought pursuant to the FMLA under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)).[6]

Alternatively, "to prevail on a claim of interference with her FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio,* 817 F.3d at 424. *See also Coutard v. Mun. Credit Union*, 848 F.3d 102, 108 (2d Cir. 2017) (quoting 5 *Graziadio* elements and noting that "our Court has 'formally adopt[ed]' this 'standard regularly used by district courts of this Circuit' – . . . [for a plaintiff] to prevail on an interference claim") (quoting *Graziadio*, 817 F.3d at 424).

## 2. <u>Fifth Count - Retaliation in Violation of FMLA</u>

As set forth *supra*, in order to state a plausible FMLA retaliation claim, Plaintiff must plead sufficient facts to establish the four requisite elements. Solely for purposes of the motion,

---

[5] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[6] If the plaintiff successfully meets the initial burden of alleging the elements of retaliation, the burden shifts back to the employer to state a legitimate non-discriminatory reason for its action. Then, if the defendant is able to provide such a reason, the burden returns to the plaintiff to prove that the defendant's articulated reason for its action is "pretextual" so that the only real reason was retaliation for plaintiff's exercise of rights protected under the FMLA. *See Graziadio*, 817 F.3d at 429. *See also, e.g., Stevens v. Coach U.S.A.*, 386 F. Supp. 2d 55, 61 (D. Conn. 2005); *Kuo v. Computer Assocs. Int'l, Inc.*, No. 05-CV-3295 (DRH) (JO), 2007 WL 2874845, at *5 (E.D.N.Y. Sept. 27, 2007).

"Defendant concedes that the Complaint alleges that: Plaintiff was at least minimally qualified for her position; Plaintiff suffered an adverse employment action; and such adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Doc. 17, at 5. However, Defendant asserts that the "Complaint fails to allege any facts establishing the first element of the prima facie case – *i.e.*, that Plaintiff sought to exercise rights under the FMLA." *Id.*, at 6.

In order to exercise rights under the FMLA, one must request FMLA leave due to a qualifying illness or condition. *See, e.g., Hahn v. Office & Prof'l Employees Int'l Union, Local 153*, No. 13-CV-946 (JGK), 2016 WL 4120517, at *5 (S.D.N.Y. July 22, 2016) (citing *Wahl v. Cty. of Suffolk*, 466 F. App'x 17, 20 (2d Cir. 2012) (summary order) (holding that an employee who chose to use his employer's sick leave policy instead of FMLA leave had not exercised his FMLA rights)). Although one need not expressly invoke the statute, one must at least provide "a basis for her leave that qualifies under the FMLA." *Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 408-09 (S.D.N.Y. 2007) (citation omitted). *See also Slaughter v. Am. Bldg. Maint. Co. of New York,* 64 F. Supp. 2d 319, 326 (S.D.N.Y. 1999) ("[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." ) (quoting *Brohm v. JH Properties, Inc.,* 149 F.3d 517, 523 (6th Cir. 1998)); *Basso v. Potter*, 596 F. Supp. 2d 324, 338 (D. Conn. 2009) ("[T]he FMLA does not require an employer to be clairvoyant.") (citations and internal quotations marks omitted); *McNamara v. Trinity Coll.*, No. 3:12CV363 JBA, 2013 WL 164221, at *4 (D. Conn. Jan. 15, 2013) (For purposes of notice under the FMLA, "[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.") (quoting *Darboe v. Staples, Inc.*, 243 F.Supp.2d 5, 17 (S.D.N.Y. 2003)).

In its 2009 regulations, the United States Department of Labor addressed the required content of notice under the FMLA. *See* 29 C.F.R. §§ 825.302(c); 825.303(b). Under those regulations, if the illness is foreseeable, the employee must "provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R § 825.302(c). "Depending on the situation, such information may include[, *inter alia*,] that a condition renders the employee unable to perform the functions of the job; that the employee . . . has been hospitalized overnight; whether the employee or the employee's family member is under the continuing care of a health care provider; if the leave is due to a qualifying exigency, . . . and that the requested leave is for one of the reasons listed in § 825.126(b)." *Id.*

"When an employee seeks leave for the first time for a[n] FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." *Id.* Moreover, "[i]n all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." *Id.* "In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave." *Id.*

If the need for the leave is unforeseeable – such as a sudden illness, "an employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *Id.* § 825.303 (b).[7] Moreover, "[c]alling in "sick" without providing

---

[7] As to timing of the notice, "[g]enerally, under the FMLA, employees are required to provide, whenever possible, at least thirty days' notice for leave that is foreseeable." *Slaughter v. Am. Bldg. Maint. Co.*, 64 F. Supp. 2d 319, 325 (S.D.N.Y.1999) (citing 29 U.S.C. § 2612(e)(1); 29

more information will not be considered sufficient notice to trigger an employer's obligations under the Act."[8]  *Id.*

To qualify as a basis for FMLA leave, one must have a "serious health condition," which is defined as "an illness, injury, impairment, or physical or mental condition that involves" either "inpatient care" in a medical facility or "continuing treatment by a health care provider." 29 U.S.C. § 2611 (11)(A)-(B).  *See also* 29 C.F.R. § 825.113(a).[9]  Notice must, therefore, reference or describe

---

C.F.R. § 825.302(a)).  However, if need for FMLA leave arises unexpectedly, the applicable regulations provide that notice should be given "as soon as practicable under the facts and circumstances of the particular case" and "within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible." *Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 408 (S.D.N.Y. 2007) (citing 29 C.F.R. § 825.303 (a) (captioned "Timing of notice").

[8]  *See also Brown,* 488 F. Supp. 2d at 409 ("Merely calling in sick . . . is insufficient to put a company on notice that an employee is requesting leave that may be eligible under the FMLA."). "[B]ecause FMLA leave applies only to a 'serious health condition' or 'chronic serious health condition' as defined under 29 C.F.R. § 825.114, an employee's reference to being sick 'does not suggest to the employer that the medical condition might be serious or that the FMLA otherwise could be applicable.'" *Basso* v. 596 F. Supp. 2d at 338-39 (quoting *Phillips v. Quebecor World RAI Inc.*, 450 U.S. 308, 312 (7th Cir. 2006)).  *See also Festerman v. Cnty. of Wayne*, 611 F. App'x 310, 315 (6th Cir. 2015) ("merely 'calling in sick' is insufficient to trigger any obligation of the employer under the FMLA."); *Brown v. Kansas City Freightliner Sales, Inc*., 617 F.3d 995, 997-98 (8th Cir. 2010) (plaintiff's calling in sick and stating that she would not be reporting to work did not trigger employer's obligations under the FMLA), *cert. den.*, 562 U.S. 1217 (2011) ; *de la Rama v. Ill. Dep't of Human Servs*., 541 F.3d 681, 687 (7th Cir. 2008) ("Calling in sick without providing additional information does not provide sufficient notice under the FMLA") (citation omitted).

[9]  The applicable regulation's definition of "serious health condition" appears in 29 C.F.R. § 825.113(a)-(c), and provides:

> (a)     For purposes of FMLA, serious health condition entitling an employee to FMLA leave means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 or continuing treatment by a health care provider as defined in § 825.115.

> (b)     The term incapacity means inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment

such a serious health condition to place an employer on notice of FMLA leave.

Then, "[u]nder the FMLA, the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Tambash v. St. Bonaventure Univ.*, No. 99CV967, 2004 WL 2191566, at *10 (W.D.N.Y. Sept. 24, 2004) (citations and internal quotation marks omitted.). As stated in the regulations, in making the requisite notification, "[a]n employee seeking leave need not expressly invoke the FMLA." *Brown*, 488 F.Supp. 2d at 408-09. "[I]t is sufficient that she give a basis for her leave that

---

therefore, or recovery therefrom.

(c)     The term treatment includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations. A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen). A regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.

Furthermore, any subsequent treatment or period of incapacity relating to the same condition involves:

(1)     Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(2)     Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.115(1)-(2).

qualifies under the FMLA." *Id.*

Examining the facts in the instant case, the Court must determine whether the notice Plaintiff gave to Thurston regarding illnesses on two occasions included a qualifying basis under the FMLA. To qualify as such a basis, there must be a "serious health condition" pursuant to 29 U.S.C. § 2611 (11)(A)-(B). Such an illness, injury, impairment or condition must involve either "inpatient care," in a hospital, hospice or medical care facility, or "continuing treatment by a health care provider." *Id.*

### a. <u>Walking Pneumonia/Respiratory Infection</u>

In the case at bar, Plaintiff alleges that in early April 2015, she was diagnosed with walking pneumonia and a respiratory infection, and her physician instructed her to stay out of work for two days. Doc. 1, ¶ 10. She communicated this information to her employer through a doctor's note. *Id.* ("At that time, the plaintiff provided the defendant company with a copy of an out-of-work note from her physician."). Plaintiff does not convey the exact content of the note, but the implication is that it "instructed her to remain out of work for two (2) days." *Id.* In response to receipt of the note, Thurston allegedly informed Plaintiff that she "was not entitled to sick pay" but granted two days of leave, as recommended by her doctor. *Id.*, ¶¶ 11-12. After her two days of leave, Plaintiff returned to work but informed management that she needed to temporarily "lighten her work load" until her symptoms improved. *Id.*, ¶ 12. There is no allegation that she received further medical treatment or provided another doctor's note to explain this need.

In response to this new request, Plaintiff alleges that "defendant's management reminded her that she was not permitted to take breaks" and would be "required to work full twelve and a half (12.5) hour shifts." *Id.,* ¶ 12. In other words, there were no measures taken to lighten her work load.

Plaintiff does not allege that she requested to take any additional days of leave or intermittent leave. Rather, she alleges that she requested to "lighten her work load" while performing the work on her shift. *Id.*

With respect to this illness of walking pneumonia and/or respiratory infection, Plaintiff's notice did not provide Thurston with sufficient facts to conclude that said illness was a "serious health condition," a qualifying basis under the FMLA. Granted, the note indicated that Plaintiff had consulted a doctor and that, per that consultation, she needed two days of leave. However, two days of medical leave do not, in and of themselves, provide notice of a "serious health condition" under the FMLA.

With Congressional authority, under 29 U.S.C. § 2654, the Department of Labor prescribed substantive regulations regarding the type of illnesses and conditions that qualify as serious health conditions under the FMLA. "From this regulation, the Department of Labor has developed a test for what illnesses qualify as serious health conditions. If an employee is (1) incapacitated for more than three days, (2) seen once by a doctor, and (3) prescribed a course of medication, such [as] an antibiotic, she has a 'serious health condition' worthy of being covered by the FMLA." *Boyce v. New York City Mission Soc.*, 963 F. Supp. 290, 299 (S.D.N.Y. 1997) (citing Department of Labor's "brightline test" in *Brannon v. OshKosh B'Gosh, Inc.,* 897 F. Supp. 1028, 1036 (M.D. Tenn. 1995)). *See also* 29 C.F.R. § 825.113 (defining "serious health condition"); 29 C.F.R. § 825.115(a) ("A serious health condition involving continuing treatment by a health care provider includes any one or more of the following: . . . A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition . . . ").

According to the allegations of the Complaint, Plaintiff visited a doctor and was given a note

that she needed to be absent from work for *two days*.  She provided Thurston with a "copy of an out-of-work note from her physician" with respect to those two days.  She did not indicate that she was prescribed a course of medication or that she needed additional time off (beyond two days' absence) for this illness.

Upon returning to work, Plaintiff requested "to lighten her workload," but she failed to provide another doctor's note or to otherwise indicate that a reduced workload was medically necessary due to a serious health condition  (*e.g.*,  because she was   "incapacitated" or unable to work or perform her usual work duties),  29 C.F.R. § 825.113(a)-(b).  Accordingly, her condition, as described in her allegations was not "serious" within the Department of Labor's three-pronged test for a "serious health condition" under the FMLA.[10]

_____

[10]  The legislative history behind the FMLA helps clarify Congress's definition of "serious health condition."  The relevant Senate Report states:

> With respect to an employee, the term "serious health condition" is intended to cover conditions or illnesses that affect an employee's health to the extent that he or she must be absent from work on a recurring basis or *for more than a few days* for treatment or recovery. . . .
>
> The term "serious health condition" is not intended to cover short-term conditions for which treatment and recovery are very brief. It is expected that such conditions will fall within even the most modest sick leave policies. Conditions or medical procedures that would not normally be covered by the legislation include minor illnesses which last only a few days and surgical procedures which typically do not involve hospitalization and require only a brief recovery period. . . .
> . . . . .
> Examples of serious health conditions include but are not limited to heart attacks, heart conditions requiring heart bypass of valve operations, most cancers, back conditions requiring extensive therapy or surgical procedures, strokes, severe respiratory conditions, spinal injuries, appendicitis, pneumonia, emphysema, severe arthritis, severe nervous disorders, injuries caused by serious accidents on or off the job, ongoing pregnancy, miscarriages, complications or illnesses related to pregnancy, such as severe morning sickness, the need for prenatal care, childbirth and recovery from childbirth. All of these conditions meet the general test that either the

In *Jackson v. Rite Aid Corp.*, No. 05-10329-BC, 2007 WL 2324951, at *9 (E.D. Mich. Aug. 13, 2007), a factually similar case, the plaintiff, a pharmacist technician, sued her drug store employer for retaliation for her exercise of rights under the FMLA, alleging that she had taken leave for the "serious medical condition" of "walking pneumonia."  The court stated that "[i]t is questionable whether 'walking pneumonia' could ever be considered a serious health condition since it is distinguished from pneumonia because of its lesser severity and the ability of the patient with the illness to carry on without need for bed rest or hospitalization." 2007 WL 2324951, at *9 (citing Edward Rosenow, M.D., "Walking Pneumonia: What does it mean?", http://www.mayoclinic.com/health/walking-pneumonia/AN00137).[11]  However, "[e]ven assuming that walking pneumonia could theoretically be serious, the instant Plaintiff has not averred or provided any evidence that her actual condition was serious." 2007 WL 2324951, at *9.  During the time frame for which she sought leave, "she ha[d] not alleged that she was given any medical advice to avoid work or that she was under any regimen of medical treatment." *Id.*

In the case at bar,  Plaintiff sought only two days off regarding this illness and never alleged thereafter that "she was given any medical advice to avoid work or that she was under any regimen of medical treatment." *Id.*  Under such circumstances, her allegations regarding walking pneumonia

_____

underlying health condition or the treatment for it requires that the employee be absent from work on a recurring basis or for more than a few days for treatment or recovery. They also involve either inpatient care or continuing treatment or supervision by a health care provider, and frequently involve both.

S. Rep. No. 3, 103d Cong., 1st Sess.1993, 1993 U.S.C.C.A.N. 3, at pp. 30–31 (emphasis added).

[11]   The Court takes judicial notice that "[w]alking pneumonia is an informal term for pneumonia that isn't severe enough to require bed rest or hospitalization" but "may feel like [one] ha[s] a cold." *See*  https://www.mayoclinic.org/diseases-conditions/pneumonia/expert-answers/walking-pneumonia/faq-20058530.

fall short of the definition of "serious health condition." *Jackson*, 2007 WL 2324951, at *9 (citing 29 C.F.R. § 825.114). *See also Murray v. Red Kap Industries*, 124 F.3d 695, 699 (5th Cir.1997) (affirming summary judgment in favor of defendant finding that no serious health condition existed where plaintiff had a respiratory tract infection that was almost pneumonia but where she provided no medical information regarding her inability to work during the bulk of her absence); *Brannon v. OshKosh B'Gosh, Inc.*, 897 F. Supp. 1028, 1037 (M.D. Tenn. 1995) ("Plaintiff does not meet the definition of serious health condition because, although she saw a doctor and was given three prescriptive drugs, there is no proof that plaintiff was "incapacitated" for more than three calendar days.").[12]

Because Plaintiff has not alleged sufficient facts to demonstrate that her "walking pneumonia and respiratory illness" constituted a "serious health condition" under the FMLA, she could not have exercised rights under that statute when she took her two days of leave. Therefore, even if she was qualified for her position and she suffered an adverse employment action (termination) at some point after she took these two days, she could not have been terminated in retaliation for the exercise of FMLA rights. With respect to walking pneumonia and a respiratory infection, she never exercised rights protected under the FMLA. This portion of her FMLA claim will be dismissed.

**b. Asthma**

As to Plaintiff's second illness, she alleges that she "suffered a bronchial asthma attack while

---

[12] *See also* H.R. Rep. No. 8, 103rd Cong., 1st Sess., pt. 1 at 29 (1993) (providing a non-exhaustive list of "serious health conditions" under the FMLA, which includes "pneumonia" but not "walking pneumonia"); *Boyce v. New York City Mission Soc.*, 963 F. Supp. 290, 299 (S.D.N.Y. 1997) ("[I]t is clear from the examples provided that Congress intended "serious health condition' to mean serious illnesses and not minor health conditions," which "Congress intended . . . to be covered by an employer's sick leave policy.").

in the office, and sought emergency treatment at the MidState Medical Center in Meriden, where she underwent x-rays, was prescribed an inhaler, and put on medication." Doc. 1, at 9 (¶ 16). She thereafter "returned to work, and despite her condition, was again instructed by the defendant that she was still required to work the full twelve and a half (12.5) hour shifts, without breaks for rest or lunch.

Plaintiff's asthma generally qualifies as a "serious health condition" under the FMLA because it is a "severe respiratory condition."[13] *See* H.R. Rep. No. 8, 103rd Cong., 1st Sess., pt. 1 at 29 (1993); U.S. Code Cong. & Admin. News 1993 at 3, 31; *see also* 58 Fed.Reg. 31,799 (1993) ("The Family and Medical Leave Act of 1993," 58 FR 31794-01). Emergency medical treatment for such a condition would thus be covered by the FMLA. Moreover, asthma may constitute a "chronic condition," because, as the regulations state, it "may cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)." C.F.R. § 825.115(c)(3) ("Continuing Treatment"). Therefore, under the FMLA, asthma may, due to its chronic nature, result in a need for "[i]ntermittent leave or leave on a reduced leave schedule" where such leave is "medically necessary due to a serious health condition," 29 C.F.R. § 825.302 (f).[14] *See* 29 U.S.C. § 2612(b)(1)

---

[13] Asthma has been deemed a "serious health condition" because it may require an employee to be absent from work on a recurring basis or for more than a few days for treatment or recovery. In addition, asthma may "involve either inpatient care or continuing treatment or supervision by a health care provider, and frequently involve both." S. Rep. No. 3, 103d Cong., 1st Sess.1993, 1993 U.S.C.C.A.N. 3, at pp. 30-31.

[14] 29 C.F.R. § 825.302(f) provides, in pertinent part:

Intermittent leave or leave on a reduced leave schedule must be medically necessary due to a serious health condition or a serious injury or illness. An employee shall advise the employer, upon request, of the reasons why the intermittent/reduced leave schedule is necessary and of the schedule for treatment, if applicable.

19

(Leave for incapacity "may be taken intermittently or on a reduced leave schedule when medically necessary.").

In her Complaint, Plaintiff alleges that she "suffered a bronchial asthma attack while in the office, and sought emergency treatment at the MidState Medical Center in Meriden, where she underwent x-rays, was prescribed an inhaler, and put on medication." Doc. 1, ¶ 16. A severe bronchial asthma attack plausibly constitutes a "medical emergency" resulting from a serious health condition under the FMLA. Such an incident, occurring *in the office*, on Thurston's premises, was sufficient to apprise Thurston that Plaintiff was suffering from an unforeseeable, serious asthma attack which required emergency medical treatment.[15] *See, e.g.*, *Skates v. Inc. Vill. of Freeport,* No. 15- CV-1136 (SJF) (AYS), 2016 WL 1459659, at *19 (E.D.N.Y. Jan. 28, 2016) (finding that when plaintiff called her employer to state she was in the emergency room (for surgery on torn ligaments

_____

*See also Hewett v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 15 (D. Conn. 2016) ("an employee suffering from an ongoing 'serious health condition' may request intermittent or reduced-schedule leave, but the employee must request that accommodation explicitly")(citing 29 U.S.C. § 2612(b)), *appeal dismissed* (July 1, 2016), *reconsideration denied*, No. 3:13-CV-1382 (SRU), 2016 WL 3101998 (D. Conn. June 2, 2016).

[15] In other words, when Plaintiff left Thurston's workplace during her emergency attack, it is plausible that Defendant had sufficient information to put it on notice, or at least inquiry notice, that Plaintiff needed to take leave as soon as was practicable. As District Judge Townes in this Circuit explained:

> Once notice of the need for leave is provided, an employer has an affirmative duty to make certain inquiries of the employee. In particular, "the employer is on inquiry notice and bears the burden of ascertaining further details to determine whether the leave qualifies for FMLA protection. Sufficient notice is given when the employee requests leave for a covered reason. After a notice of this sort, the employer can inquire further to determine if the FMLA applies.

*Debell v. Maimonides Med. Ctr.*, No. 09-CV-3491 (SLT) (RER), 2011 WL 4710818, at *7 (E.D.N.Y. Sept. 30, 2011) (citations and internal quotation marks omitted).

in her wrist), "she supplied Defendant [employer] with information that would put it on notice, or at least inquiry notice, of Plaintiff's intent to take leave as soon as was practicable"), *report and recommendation adopted*, 2016 WL 1452391 (E.D.N.Y. Apr. 12, 2016).

Upon notice of such an emergency incident, "[t]he employer will be expected to obtain any additional required information through informal means." *Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 408 (S.D.N.Y. 2007). That enables the employee or his or her spokesperson to "provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation." *Id.*[16] Subsequent incapacity or follow-up treatment for a "chronic serious health condition," such as asthma, also falls under the FMLA, even if it creates an "episodic [event] rather than a continuing period of incapacity." *See* 29 C.F.R. § 825.115 (c) ("Continuing treatment" for "[c]hronic conditions").

Plaintiff also alleges that when she returned to work following her severe asthma attack, Defendant "instructed" her that "she was still required to work the full twelve and a half (12.5) hour shifts, without breaks for rest or lunch." *Id.*, ¶ 17. Reading the facts in the light most favorable to Plaintiff, her allegation regarding Defendant's instruction implies that Defendant may have either

---

[16] In cases where a medical emergency occurs at work, an employer may become aware of the need for FMLA leave at the time the employee leaves work to seek emergency medical treatment. *See, e.g., Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 422 (S.D.N.Y. 2004) (Employer placed employee on FMLA leave for alcohol addiction rehabilitation after her supervisor observed that she was "slumped over in her chair in what appeared to be a state of semi-consciousness" and "escorted her to the emergency room at New York Presbyterian Hospital"); *Slaughter v. Am. Bldg. Maint. Co. of New York*, 64 F. Supp. 2d 319, 327 (S.D.N.Y. 1999) ("In the case of a medical emergency requiring leave because of an employee's own serious health condition . . . written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.") (quoting *Mora v. Chem-Tronics, Inc.*, 16 F. Supp. 2d 1192, 1216–17 (S.D. Cal.1998)). *See also* 29 C.F.R. § 825.303(a).

denied Plaintiff future FMLA leave or prevented her from asking for it.[17]  In either event, that action would be in violation of the FMLA.  Telling Plaintiff she could not reduce her schedule for a possible chronic serious health condition was, at the least, misleading because asthma is the kind of illness that might medically necessitate "[i]ntermittent leave or leave on a reduced leave schedule," 29 C.F.R. § 825.302 (f).

Assuming all allegations in the Complaint are true, Plaintiff states a plausible claim for retaliation under the FMLA. *See Potenza*, 365 F.3d at 168.  Defendant has conceded for purposes of the motion that Plaintiff has met three of the requisite  elements: "Plaintiff was at least minimally qualified for her position; Plaintiff suffered an adverse employment action [termination]; and such adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Doc. 17, at 5.  As to the fourth element, Plaintiff has pled sufficient facts for the Court to deduce that she took leave under the FMLA when she left work to obtain emergency medical treatment for her bronchial asthma attack.

Furthermore, from the Complaint, it appears that after Plaintiff returned to work, she and Defendant may have discussed her asthma and/or a request for a reduced schedule because Defendant felt it was necessary to clarify that Plaintiff would be expected to resume a full schedule by "instruct[ing] . . . that she was still required to work the full twelve and a half (12.5) hour shifts, without breaks for rest or lunch." Doc. 1, ¶ 17.  Whether Plaintiff was questioned by Defendant regarding her asthma and/or whether she sought additional leave (*e.g.*, intermittent leave or a reduced

---

[17] Plaintiff asserts  in her memorandum in opposition to defendant's motion to dismiss that "[s]he returned to work [after the walking pneumonia/respiratory infection], got sick at work [with an asthma attack], and requested reasonable accommodations that were not provided to her." Doc. 25, at 12.

schedule) under the FMLA will be facts to be established at trial. At the pleading stage, however, Plaintiff has alleged sufficient facts to plausibly suggest that she had an illness covered by the FMLA and exercised, and/or attempted to exercise, rights under the statute when she sought emergency medical treatment.[18] The Court will therefore deny Defendant's motion to dismiss Plaintiff's FMLA retaliation claim regarding asthma in the Fifth Count.

### 3. Sixth Count - Interference in Violation of FMLA

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the statute. 29 U.S.C. § 2615(a)(1). The second type of recognized FMLA claim is thus one for interference. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (*per curiam*). "To succeed on a claim of FMLA interference, a plaintiff must establish that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). *See also* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise [ ] any right provided under this subchapter."); *Potenza*, 365 F.3d at 168 (stating that in FMLA interference claims, "the question is simply whether the employer in some manner impeded the employee's exercise of his or her right").

In short, in an interference claim, the result must be that the employer denies the employee

---

[18] As legal commentators have stated in the context of explaining FMLA regulations, under 29 C.F.R. §825.301(d), "[w]hen an employer learns that an employee has taken FMLA leave after the leave has begun [e.g., for an emergency condition], the employer may designate retroactively the entire or some portion of the leave as FMLA leave, as long as that leave qualifies as FMLA leave." Susser, Peter A. & Berry, David B., Family and Medical Leave Handbook, ¶ 130 ("Frequently Asked Leave Questions"), 2003 WL 25316974 (Bus. & Legal Resources 2017).

benefits under the FMLA.  *See, e.g., Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 363 (S.D.N.Y. 2016) ("Purported interference with FMLA rights must ultimately result in the denial of a benefit under the FMLA.").  Under the FMLA, an employer is generally required to give an eligible employee up to twelve work weeks of leave per year for a serious health condition that makes the employee unable to perform the essential functions of his position.  *See* 29 U.S.C. § 2612(a)(1)(D).  It is unlawful for an employer to interfere with, restrain, or deny an employee's actual or attempted exercise of a right provided by the Act.  *Id.* § 2615(a)(1).

In Count Six, Plaintiff alleges that Thurston "interfered with the plaintiff's right to take leave in that it failed to apprise the plaintiff of her rights under the FMLA" and "terminat[ed] her employment as opposed to offering job-protected medical leave."  Doc. 1, at 19 (¶ 50).  "With respect to interference claims under the FMLA, [the Second Circuit] has 'formally adopt[ed]' the 'standard regularly used by district courts of this Circuit' – . . . that is, that to prevail on an interference claim, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA."  *Coutard v. Mun. Credit Union*, 848 F.3d 102, 108-09 (2d Cir. 2017) (quoting *Graziadio*, 817 F.3d at 424).  Defendant asserts that Plaintiff failed to plead the last two elements, stating that "[s]he simply did not request any FMLA leave that she was denied."  Doc. 17, at 11.

As Plaintiff alleges, "the failure to provide notice that inhibits or restricts an employee from successfully obtaining leave or the right to reinstatement does result in a denial of benefits and can

result in a cause of action for interference." *Fernandez,* 159 F. Supp. 3d at 363.[19]  Moreover, an employee meets the notice requirement under the FMLA if he or she "provide[s] sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b).  At that point, the "notice [is sufficient] to trigger an employer's obligations under the Act" so that "[t]he employer will be expected to obtain any additional required information through informal means," *id.,* and then to "notify the employee of [his or her] eligibility to take FMLA leave within five days." *Id.* § 825.300 (b)(1).

On the other hand, an employer's failure to provide notice of the terms of the FMLA, "where the lack of notice had no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the Act," fails to state an FMLA claim for interference. *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999).  "The Act makes it unlawful for the employer to impede an employee's *actual* or *attempted 'exercise'* of a right provided under [the statute]." *Id.* (emphasis added).  "A right to receive notice is not a right that the intended recipient of the notice 'exercise[s].'" *Id.  See also, e.g.*, *Basso v. Potter*, 596 F. Supp. 2d 324, 340 (D. Conn. 2009) (Plaintiff erred in arguing that his employer "improperly denied him FMLA leave" for his absence by failing to notify him that he had the right to submit supplemental medical information; "the [employer's] duty to inquire further about [plaintiff's] medical certification is triggered only upon its receipt of adequate notice that [plaintiff] sought to take FMLA leave for his . . . absence.").

---

[19]  In addition, "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).  "It would also include manipulation by a covered employer to avoid responsibilities under FMLA . . . ." *Id.  See also DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 182 (D. Conn. 2015) (discussing 29 C.F.R. § 825.220(b)).

### a.   Walking Pneumonia/Respiratory Infection

Under *Sarno*, the Plaintiff has no private right of action based on her employer's failure to provide notice of the FMLA's terms *unless* lack of notice affected her exercise or attempt to exercise her substantive FMLA rights.[20]   In the allegations of her Complaint, as to "walking pneumonia" or a "respiratory infection,"  Plaintiff fails to set forth facts to establish that she exercised or attempted to exercise rights regarding a "serious health condition" under  the FMLA.  Plaintiff's allegations regarding "walking pneumonia" and/or a "respiratory infection" do not establish that she was incapacitated for  a period of more than three consecutive calendar days or needed continuing treatment by a health care provider.  She thus failed to allege she was suffering from a "serious health condition" under the FMLA.  *See*  Part II.B.2.a., *infra*.

Plaintiff returned to work from a two-day absence and never informed Defendant that she remained incapacitated or needed further medical treatment.  She alleged that in April of 2015, she "was diagnosed with walking pneumonia and a respiratory infection," her "physician instructed her to remain out of work for two (2) days," and "plaintiff provided the defendant company with a copy of an out-of-work note from her physician."  Doc. 1, ¶ 10.  She then "returned to work two (2) days later but informed Thurston's management that she would need to lighten her work load, at least

---

[20] *See also Palma v. Pharmedica Commc'ns, Inc.*, No. CIV. 3:00-CV-1128 (AHN), 2001 WL 406330, at *3 (D. Conn. Apr. 11, 2001) ("The court notes that a majority of other courts that have addressed this issue have held that there is no private right of action for an employer's violation of the FMLA's notice requirement.") (collecting cases); *Hale v. Mann*, 219 F.3d 61, 69 (2d Cir. 2000) (noting that in *Sarno*, it considered and rejected the employee's claim that his FMLA rights were infringed by the employer's failure to inform him that the FMLA entitled him to a leave of up to twelve work weeks).

temporarily, until her symptoms improved." *Id.*, ¶ 12.  Defendant reminded her that she "was required to work full twelve and a half (12.5) hour shifts" and "was not permitted to take breaks." *Id.*, at 8-9 (¶ 12).

Under the alleged facts, Plaintiff did not give notice of an intention to take leave for a sufficiently "serious health condition" under the FMLA. *See* 29 C.F.R. § 825.113.  A request to lighten one's workload without alleging a "chronic" or continuing "serious health condition" is not sufficient to invoke the FMLA.  Here Plaintiff presented no "serious health condition" to support the need for a modified workload under the FMLA. *See, e.g.,  Nowak v. EGW Home Care, Inc.*, 82 F. Supp. 2d 101, 112 (W.D.N.Y. 2000) (granting motion to dismiss Plaintiff's FMLA claim for interference where her "allegations [were] simply insufficient to raise a reasonable inference that plaintiff's health condition involved a continuing course of treatment, or otherwise caused a period of incapacity").[21]  As to walking pneumonia and/or a respiratory infection, Plaintiff has failed to state a plausible claim that Thurston interfered with the exercise of her rights under the FMLA.

### b.  Asthma

As to her asthma, Plaintiff experienced a bronchial asthma attack in the office and was forced to leave to seek emergency medical treatment.  Doc. 1 ("Complaint"), ¶ 17.  Accepting

---

[21]  As two legal commentators noted, "[t]o qualify for intermittent leave," if an employee is not incapacitated for more than three consecutive calendar days," he "may have a *recurring chronic condition*, with each episode being short-lived, such as asthma or migraines, . . . if a health care provider had previously certified the employee's health condition and need for such leave." Susser, Peter A. & Berry, David B., Family and Medical Leave Handbook, ¶ 130 ("Frequently Asked Leave Questions"), 2003 WL 25316974 (Bus. & Legal Resources 2017) (emphasis added).  In contrast, "an employer is under no obligation to create a 'light-duty' assignment for an employee who wishes to return to work from FMLA leave." *Id.*

Plaintiff's factual allegations as true and drawing all reasonable inferences in the her favor, asthma may be a sufficiently serious health condition to give rise to FMLA benefits. Moreover, if this was a "chronic" condition, Plaintiff may have been entitled to take intermittent or reduced-schedule leave.

In her brief in opposition to Thurston's motion to dismiss, Plaintiff states that she "suffered from *medical and health-related conditions*" and "defendant could certainly have made the plaintiff aware of her right to leave under the FMLA." Doc. 25, at 12 (emphasis in original). Plaintiff argues that "[a]t no time was [she] advised of her FMLA rights" and that "[t]he law is clear that the burden is on the employer to advise the plaintiff of her FMLA rights once the employer is on proper notice." *Id.*

Plaintiff is correct that, when there is a need for unforeseeable FMLA leave, once the employer receives sufficient information to reasonably determine that the FMLA may apply to that leave, the employer's duty to notify the employee of his or her FMLA rights arises. Specifically, "[w]hen an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA–qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1).[22]

---

[22] 29 C.F.R. § 825.300 prescribes the general notice that must be given by a covered employer:

> (a) General notice. (1) Every employer covered by the FMLA is required to post and keep posted on its premises, in conspicuous places where employees are employed, a notice explaining the Act's provisions....
> ....
> (3) If an FMLA-covered employer has any eligible employees, it shall also provide this general notice to each employee by including the notice in employee handbooks

As District Judge Sweet described in *Slaughter v. American Building Maintenance Company of New York*, 64 F. Supp. 2d 319 (S.D.N.Y. 1999) :

> It is not necessary for an employee to invoke the [FMLA] statute expressly, or to refer to the statute when communicating his or her need for leave to the employer. *See Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir.1998); *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 762 (5th Cir.1995). It is notice of the qualifying reason for leave, and not notice of the FMLA basis for that leave, that must be communicated. Indeed, the FMLA places a significant burden on the employer to both make itself aware of the FMLA's dictates and to inform its employees of their rights under the FMLA. *See* 29 U.S.C. § 2619; 29 C.F.R. §§ 825.300(a), .301. Once an employee gives proper notice of his or her need for leave, the onus shifts to the employer to inquire further if it needs further information to ascertain whether the leave is FMLA-qualifying.

*Id.* at 325.

In addition, although "[f]ailure to notify an employee of FMLA procedures does not, in and of itself, constitute an interference with the exercise of those rights," such failure to notify may "constitute interference with an employee's FMLA rights, if the lack of notice caused the employee to forfeit FMLA leave." *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 430 (S.D.N.Y. 2004). *See also* 29 C.F.R. § 825.300(e) ("Failure to follow the notice requirements set forth in this section may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA

---

> or other written guidance to employees concerning employee benefits or leave rights, if such written materials exist, or by distributing a copy of the general notice to each new employee upon hiring. In either case, distribution may be accomplished electronically.
>
> (4) To meet the requirements of paragraph (a)(3) of this section, employers may duplicate the text of the notice contained in Appendix C of this part or may use another format so long as the information provided includes, at a minimum, all of the information contained in that notice.

29 C.F.R. §§ 825.300(a)(1), (3), and (4).

rights."). "The alleged interference must ultimately result in a denial of a benefit under the FMLA." *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 182 (D. Conn. 2015).

For example, in the case at bar, if, upon learning of Plaintiff's severe bronchial asthma attack at work, Defendant misled or misinformed Plaintiff by stating that she was not entitled to take additional FMLA leave or "intermittent or reduced-schedule leave", Defendant's conduct may have caused Plaintiff to forfeit her right to take such FMLA leave. Defendant's conduct would thus constitute interference. *See, e.g.*, *Ridgeway v. Royal Bank of Scotland Grp.*, No. 3:11-CV-976 VLB, 2012 WL 1033532, at *7 (D. Conn. Mar. 27, 2012) ("Misleading information can also interfere with an employee's attempt to exercise his or her rights under the FMLA.") (citing *Kanios v. UST, Inc.*, No. 3:03-CV-369 (DJS), 2005 WL 3579161, at *10-11 (D. Conn. Dec. 30, 2005)).

"While the FMLA does not define the term 'interference,' the United States Department of Labor has promulgated a regulation explaining that '[i]nterfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'" *Ridgeway,* 2012 WL 1033532, at *6 (quoting 29 C.F.R. § 825.220(b)). *See also LaCoparra v. Pergament Home Centers, Inc.*, 982 F.Supp. 213, 230 (S.D.N.Y.1997) (holding that employer's failure to provide employees with adequate notice of FMLA procedures may constitute interference with an employee's FMLA rights, if the lack of notice caused the employee to forfeit FMLA leave); *Ridgeway,* 2012 WL 1033532, at *8 ("Although a technical violation of these regulations, absent any prejudice to the employee in the form of interference with or restraint or denial of the ability to exercise FMLA rights is not actionable, deficiencies in notice which do prejudice the employee are sufficient to substantiate a claim of interference.") (citing, *inter alia*, 29 C.F.R. § 825.300(e)).

In the case at bar, Plaintiff's allegations suggest that she was entitled to FMLA leave for her asthma. If Defendant's responses to Plaintiff when she returned to work prejudiced her by either failing to inform her of the steps she needed to take to secure FMLA leave, or even misinforming her regarding her eligibility for FMLA leave for her emergency treatment or future episodes of this illness, those responses potentially constituted "interference" with Plaintiff's ability to obtain FMLA benefits. For example, if Thurston's instructions regarding the necessity that Plaintiff work 12.5 hour shifts either had the chilling effect or fully prevented Plaintiff from taking FMLA leave, then Defendant may have interfered with Plaintiff's FMLA rights. Accordingly, the Court will allow her FMLA interference claim to proceed with respect to asthma. The allegations with respect to that condition state a plausible claim.[23]

**C.**      **Eighth Count - Common Law Wrongful Discharge and Ninth Count - Violation of Connecticut General Statutes § 31-51q**

In the Eighth Count of her Complaint, Plaintiff sets forth a tort claim for wrongful discharge alleging that "[p]ublic policy mandates that employers must comply with the Federal Motor Carrier Safety Act and the regulations promulgated by the United States Department of Transportation pursuant to the same; particularly those regarding hours of service." Doc. 1, Eighth Count, ¶ 49 (citations omitted). She further alleges that Thurston did not comply with these regulations and "wrongfully discharged the plaintiff after [she] complained internally regarding the defendant's [non]compliance with the Federal Motor Carrier Safety Act and the regulations promulgated by the

---

[23] In so stating, the Court voices no opinion as to whether Plaintiff's interference claim will ultimately succeed. Defendant has challenged that claim in a motion for summary judgment and may also, if the claim survives that motion, challenge it again at trial. Plaintiff is left to her proof as to each element of the claim. The motion for summary judgment [Doc. 33] is *sub judice* and will be decided in a separate ruling.

United States Department of Transportation pursuant to the same." *Id.*, ¶¶ 50-51. According to Plaintiff, her discharge "constitute[d] a violation of public policy." *Id.*, ¶ 52.

In the Ninth Count of her Complaint, Plaintiff asserts a cause of action under Conn. Gen. State. § 31-51q, alleging that her termination was based on her "complaints, comments and statements regarding the defendant's compliance with the Federal Motor Carrier Safety Act and the regulations promulgated by the United States Department of Transportation pursuant to the same . . . " *Id.*, Ninth Count, ¶ 49. She asserts that these statements "[a]ffected employees of the defendant company and the general public" and "were protected by the First Amendment of the Constitution and/or Article First, §§ 4 and 14 of the Constitution of the State of Connecticut." *Id.* Thurston thus allegedly violated § 31-51q "by terminating her employment on account of the exercise by plaintiff[ ] [of her] rights guaranteed by the First Amendment of the [United States] Constitution and/or "Article First, §§ 4 and 14 of the [Connecticut] Constitution." *Id.*, ¶ 50.

In its motion to dismiss, Defendant argues that in both the Eighth and Ninth Counts, "Plaintiff alleges that her employment was terminated because of her alleged statements concerning the Defendant's alleged non-compliance with the Federal Motor Carrier Safety Act and regulations." Doc. 17, at 12. Moreover, in *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 475 (1980), the Connecticut Supreme Court "recognized a common law cause of action in tort for the discharge of an at will employee" if the employee "can prove a demonstrably improper reason for dismissal," which "is derived from some important violation of public policy." *Id.* However, Defendant argues, "if a plaintiff's termination violated a public policy embodied and protected by statute, the claim for common law wrongful discharge is precluded." Doc. 17, at 13 (quoting *Lopez v. Burris Logistics*, 952 F. Supp. 2d 396, 405 (D. Conn. 2013)).

Defendant asserts that "Plaintiff alleges . . . that her alleged speech on Defendant's alleged violations of the Federal Motor Carrier Safety Act was the cause of her termination." Doc. 17, at 14. Moreover, Plaintiff "alleges that such speech both violates § 31-51q and constitutes common law wrongful discharge" so that "the sole alleged basis for Plaintiff's alleged common law wrongful discharge claim is her speech on alleged violations of the Federal Motor Carrier Safety Act." *Id.* Defendant concedes that "if Plaintiff could prove her allegations, such speech would constitute a matter of public concern." *Id.* However, because her "claims pled in the Eighth and Ninth Counts are identical except for the theory under which they are asserted," "Plaintiff has a statutory remedy for the public policy she attempts to uphold in the Eighth Count – namely Connecticut General Statutes § 31-51q." *Id.*

Defendant is correct that if Plaintiff's termination solely violated the public policy embodied in § 31-51q (providing her with a statutory remedy), her common law discharge claim under *Sheets v. Teddy's Frosted Food, Inc.,* 179 Conn. 471, 480 (1980) is precluded. *Burnham v. Karl & Gelb, P.C.*, 252 Conn. 153, 158-59 (2000). "The existence of [a] statutory remedy precludes the plaintiff from bringing a common-law wrongful discharge action based on an alleged violation" of that statute. *Burnham*, 252 Conn. at 162.

As this Court previously stated in *Lopez v. Burris Logistics*:

> [I]f a plaintiff's termination violated a public policy embodied and protected by statute, the claim for common law wrongful discharge is precluded. *See, e.g., Burnham*, 252 Conn. at 162, 745 A.2d 178 ("The existence of this statutory remedy precludes the plaintiff from bringing a common-law wrongful discharge action based on an alleged violation of § 31–51(b)"); *Swihart* [*v. Pactiv Corp.*], 187 F. Supp.2d [18,] 25 [(D. Conn. 2002)](Because "plaintiff already ha[d] an adequate statutory remedy" for employer's discriminatory practices under Title VII, the Court would "not recognize a separate claim for wrongful discharge in violation of public policy"); *Thomas v. Saint Francis Hosp. and Med. Ctr.*, 990 F.Supp. 81, 90 (D. Conn.1998) (holding it "fatal" to plaintiff's claim that there was "the availability of redress for

33

defendant's alleged discriminatory conduct under federal and state antidiscrimination laws"), *aff'd,* 198 F.3d 235 (2d Cir.1999) (Table); *Sherman v. Sedgwick James of Connecticut, Inc.*, No. CV 326150, 1997 WL 83714, at *2 (Conn.Super.Ct. Feb. 10, 1997) (granting defendant's motion to strike wrongful discharge count based on the public policy of preserving an employee's right to petition the government where plaintiff alleged an additional count for a violation of § 31–51q). In sum, if "a relevant state or federal law contains a private right of action which serves to protect the public policy allegedly violated, a wrongful discharge claim will fail." *Nanos v. City of Stamford*, 609 F.Supp.2d 260, 268 (D. Conn.2009) (citation omitted).

Conversely, if there is a distinct and alternative theory of liability, related to a public policy that is not protected by state or federal statute, a wrongful discharge action may proceed. *See, e.g.*, *Van Kruiningen v. Plan B, LLC*, 485 F.Supp.2d 92, 96 (D.Conn.2007) (plaintiffs' wrongful discharge actions, alleging discharge in retaliation for reporting casino manager's activities in serving alcoholic beverage to minor, not precluded where policy underlying their claims—"not serving alcohol to minors"—was "distinct" from the policy underlying their claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 – "protecting against sexual harassment in the workplace"); *Iosa v. Gentiva Health Servs., Inc.*, 299 F.Supp.2d 29, 34 (D.Conn.2004) (former employee's claim of wrongful discharge in violation of public policy not precluded by availability of a statutory remedy for retaliation under the Connecticut Worker's Compensation Act, Conn. Gen.Stat. § 31–290a, because retaliation claim did not embrace all of the public policy arguments in employee's wrongful discharge claims).

952 F. Supp. 2d at 405-06.

Moreover, Connecticut's Superior Courts have consistently held that a plaintiff may recover under a theory of wrongful discharge, notwithstanding a contemporaneous claim under Conn. Gen.Stat. § 31–51q, where the basis of the wrongful discharge claim is a public policy for which the plaintiff is without remedy. In particular, in deciding whether to allow a common-law wrongful discharge claim to proceed in addition to a claim pursuant to § 31-51q, Connecticut courts "have examined the factual allegations of the complaint . . . to decide the issue of whether the common-law claim is distinct." *Sowell v. Dicara*, No. UWYCV126016087S, 2015 WL 1867351, at *7 (Conn. Super. Ct. Mar. 26, 2015) (collecting cases). If the common law wrongful discharge claim is based

upon public policy considerations which are distinct from the § 31-51q claim, both claims are permitted. *Zubal v. Molecular Neuroimaging, LLC,* No. NNHCV156052589S, 2015 WL 6256434, at *8 (Conn. Super. Ct. Sept. 25, 2015). *See also, e.g., Trimboli v. Von Roll Isola Usa, Inc.,* No. NNHCV094037507S, 2010 WL 3341504, at *1-2 (Conn. Super. Ct. Aug. 3, 2010) (holding both claims "viable" where "plaintiff's common-law wrongful discharge claim is based upon the public policy of preserving the physical welfare and safety of Connecticut employees, while the plaintiff's § 31–51q claim is based upon the public policy of preserving free speech"); *Fedor v. New Samaritan Corp.,* No. CV074026586, 2008 WL 2553010, at *3 (Conn. Super. Ct. June 9, 2008) (denying motion to strike wrongful discharge claim despite alleged § 31–51q claim where discharge retaliated against employee for good faith report of potential criminal conduct in workplace); *Mirto v. Laidlaw Transit, Inc.*, No. 334231, 1993 WL 137627, at *3 (Conn. Super. Ct. Apr. 20, 1993) (finding plaintiff's common-law wrongful discharge claim, based on a statutory provision of safe and adequate transportation for school children (Conn. Gen. Stat. § 10–220), was not precluded by the plaintiff's § 31–51q claim, which was based on protecting free speech); *MacLean v. Ne. Provence of Sch. Sisters of Notre Dame in State of Conn*., No. CV91 0289572S, 1992 WL 77128, at *2 (Conn. Super. Ct. Mar. 31, 1992) ("[T]he *Sheets* claim [for common law wrongful discharge] is viable because the first count is based upon a different public policy of preserving the health and safety of those who use drugs and of patients" [where plaintiff nurse reported violations of federal and state laws regarding prescription drugs]; and the public policy violation in count four under § 31-51q was based on "preserving [plaintiff's] free speech.").[24] As one court concluded, when the wrongful

---

[24]   In *Trimboli*, the plaintiff's claim for common-law wrongful discharge was predicated on oral and written complaints she made to her employer's internal management regarding her concerns for the physical welfare and safety of Connecticut employees under Conn. Gen. Stat. § 31-49.

discharge count is "dissimilar from that of an employee's constitutionally protected right of free speech," "the plaintiff should be free to explore these two theories of his claim." *Mirto*, 1993 WL 137627, at *3.

In the case at bar, in her Eighth Count, Plaintiff alleges that she was wrongfully terminated after she complained about Thurston's violations of the Federal Motor Carrier Safety Act ("FMCSA").[25] Her discharge constituted a violation of public policy regarding prevention of accidents for public safety. She complained about Thurston's violation of the relevant regulations, which were designed and implemented to promote public safety by limiting truck drivers' hours of service. *See* Federal Motor Carrier Safety Administration, *Hours of Service of Drivers*, 76 Fed. Reg. 81,134-01, 2011 WL 6748967 (Dec. 27, 2011) (codified at 49 C.F.R. Pts. 385-86, 390, and 395) ("The purpose of the rule is to limit the ability of drivers to work the maximum number of hours currently allowed, or close to the maximum, on a continuing basis to reduce the possibility of driver

_____

Because Plaintiff had no statutory remedy under § 31-49, she was entitled to pursue both her common law discharge claim and her § 31-51q claim for free speech in voicing her concerns.

In *MacLean*, the plaintiff was employed as a registered nurse at a long-term care facility for aged nuns. In her complaint, she alleged that she was terminated because she discovered violations of a number of federal and state laws and regulations regarding controlled substances and prescription drugs. Despite the instructions of her superiors to remain silent on the issue, she "informed the defendant about these conditions in an attempt to institute reforms of the various procedures regarding the procurement, control, and dispensing of drugs." 1992 WL 77128, at *1. The court found that her wrongful discharge claim was based on the public policy of "preserving the health and safety of those who use drugs," while her § 31-51q action was based on the violation of her constitutional rights to "free speech." *Id.* at *2.

[25] According to Plaintiff, she was asked by representatives of Thurston "to falsify the company's manifest showing service time of truck drivers, by changing the service time hours of truck drivers to zero (0) hours." Doc. 1, ¶ 21. She informed her supervisor, Greg, that she believed Thurston should hire more truck drivers to accommodate all deliveries without requiring drivers to operate more hours than allowed by law. *Id.*, ¶ 22. Greg allegedly became enraged and argued with Plaintiff, screaming at her while effectively pinning her against the wall. *Id.*, ¶ 23.

fatigue. Long daily and weekly hours are associated with an increased risk of crashes and with the chronic health conditions associated with lack of sleep.").

Plaintiff brings her claim in the Ninth Count under Conn. Gen. Stat. § 31-51q. That statute provides, in relevant part:

> Any employer . . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorneys fees as part of the costs of any such action for damages.

Pursuant to § 31-51q, Plaintiff alleges that her rights to free speech, guaranteed by the federal and Connecticut state constitutions, have been violated by her discharge because she spoke out on a matter of public concern, the danger of accidents on the public highways due to Thurston's violations of the FMCSA Regulations, 49 C.F.R. § 301, *et seq*.

Reading the Complaint in the light most favorable to Plaintiff, drawing all inferences in her favor, the Court finds that both Plaintiff's common law wrongful discharge claim and her statutory claim under Conn. Gen. Stat. § 31-51q may proceed in that they are based on two distinguishable public policies. Plaintiff's Eighth Count for wrongful discharge is based upon the public policy of safe transportation, under the FMCSA.[26] Doc. 1, at 20 (¶ 49). That claim is based on protecting the

---

[26] The Court notes that there has been no argument by either party regarding whether Plaintiff could bring an action under the FMCSA. However, in the context of plaintiffs who have been injured due to violations of that statute, courts have held that there is no private right to bring an FMCSA claim. *See, e.g., Harris v. FedEx Nat. LTL, Inc.*, 760 F.3d 780, 784 n.2 (8th Cir. 2014)("We doubt there is a federal private right of action for a violation of the FMCSR" (Federal Motor Carrier Safety Regulations)); *Kavulak v. Laimis Juodzevicius, A.V. Inc.*, 994 F. Supp. 2d 337, 343-44 (W.D.N.Y. 2014)(Skretny, *J.*)("[T]his statute also does not create a private right of action to recover for personal injuries sustained by a motorist struck by a tractor-trailer driver."); *Leon v.*

public from accidents by ensuring that truck drivers limit their hours of service. Safety upon the public highways is a matter of public concern. In contrast, Plaintiff's claim in the Ninth Count under Conn. Gen. Stat. § 31-51q is based on the preservation of constitutional rights to free speech. Therefore, her wrongful discharge claim should not be precluded by her § 31-51q claim.[27] Defendant's motion to dismiss the Eighth Count for wrongful discharge will be denied.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss [Doc. 16] pursuant to Rule 12(b)(6), Fed. R. Civ. P. With respect to Plaintiff's two claims under the Fifth Count and Sixth Counts for violation of the FMLA, those Counts are dismissed as to Plaintiff's alleged illness of "walking pneumonia and respiratory infection," but allowed to proceed as to her alleged "serious health condition" of asthma. Both FMLA counts state plausible claims regarding asthma under the *Iqbal* standard.

---

*FedEx Ground Package Sys., Inc.*, No. CV 13-1005 JB/SCY, 2016 WL 836980, at *12 (D.N.M. Feb. 16, 2016) ("The Court concludes that there is no federal private right of action allowing personal injury or wrongful death plaintiffs to hold defendants liable for violations of the FMCSR.").

In any event, it is the agency (the Assistant Administrator of the FMCSA), rather than an individual plaintiff, who is empowered to investigate any alleged violation of the FMCSA. 29 C.F.R. § 386.12; *see also Firebaugh v. United States*, No. 3:12-CV-00242-MMD, 2013 WL 4048977, at *2 (D. Nev. Aug. 9, 2013) ("The USDOT is required to investigate complaints of substantial violations of the Federal Motor Carrier Safety Regulations. 49 C.F.R. § 386.12. Investigation into whether federal regulations are violated is a unique government function that private persons do not perform.").

[27] The Court notes that Plaintiff argues that her wrongful discharge and § 31-51q claims should both be allowed to proceed because she is "entitled to plead in the alternative." Doc. 25, at 19. However, the Court finds that these two claims, although predicated on Plaintiff's speech regarding the same subject matter, seek to protect two separate public policies: public safety (regarding truck drivers' operation for excessive hours under the FMCSA) and the constitutional right to free speech (on a matter of public policy). These claims are thus distinct and may co-exist.

As to Plaintiff's claim for wrongful discharge in the Eighth Count, Defendant's motion to dismiss is DENIED. That count is based upon a public policy that is distinguishable from the one upon which her claim is based in the Ninth Count, for violation of Conn. Gen. Stat. § 31-51q. A plaintiff may recover under a theory of wrongful discharge, notwithstanding a contemporaneous claim under Conn. Gen. Stat. § 31–51 q, where the basis of the wrongful discharge claim is a public policy for which the plaintiff is without remedy. Because two different public policies are implicated in Counts Eight and Nine – protection of the public from dangerously tired truck drivers and preservation of free speech – both claims state plausible claims and may proceed in this action..

The foregoing is So ORDERED.

Dated: New Haven, Connecticut
          May 9, 2018

/s/*Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge